```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                       HOUSTON DIVISION

 3
   RICHARD WINFREY, JR.,          )
 4          Plaintiff,            )
                                  )          NO. 10-CV-1896
 5   v.                           )          July 29, 2010
                                  )
 6   SAN JACINTO COUNTY, ET AL,   )
            Defendants.           )
 7

 8
                        PRETRIAL CONFERENCE
 9           BEFORE THE HONORABLE LYNN N. HUGHES

10

11

12

13   For the Plaintiff:        Ms. Rachel Steinback
                               Loevy & Loevy
14                             312 North May Street, Suite 100
                               Chicago, IL  60607
15
     For Defendants            Mr. James A. Price, Sr.
16   San Jacinto County,       Olson Olson, LLP
     et al:                    2727 Allen Parkway, Suite 600
17                             Houston, TX  77019

18   For Defendants Huff and   Ms. Shanna E. Molinare
     Duff:                     Office of the Attorney General
19                             P.O. Box 12548
                               Austin, TX  78711
20
     For Defendants Fort Bend  Mr. Randall W. Morse
21   County, et al:            Fort Bend County Attorney
                               301 Jackson, Suite 728
22                             Richmond, TX  77469

23   Court Reporter:           Bruce Slavin, RPR, CM

24
     Proceedings reported by mechanical stenography and produced
25   by computer-aided transcription.
```

```
            1            THE COURT:  Have we done anything on this one?

            2            MS. STEINBACK:  We have not.  This is our first

            3   pretrial conference, Judge, and so --

            4            THE COURT:  So,  Pi -- What is it?

00:00       5            MS. STEINBACK:  Pikett.

            6            THE COURT:  Pikett.  The same Pikett.

            7            MS. STEINBACK:  The same Pikett.  Exactly.

            8            THE COURT:  Everybody else different.

            9            MS. STEINBACK:  Everybody else different.

00:00      10            THE COURT:  All right.  Who was Sheriff when -- I

           11   don't know how to -- Do these two sheriffs overlap the whole

           12   time period?

           13            MS. STEINBACK:  Your Honor, I'm not entirely sure.

           14            MR. PRICE:  I can answer that, Judge.  At the time

00:00      15   of the arrest Lacy Rogers with the San Jacinto County

           16   Sheriff -- he left office at the end of 2008 and at that

           17   time the arrest had already been done.  The investigation

           18   had pretty much been completed.  So, James Walters came into

           19   office on July 1st of 2009, and he really had nothing to do

00:01      20   with all of the investigative work and the arrest had taken

           21   place before he took office.

           22            THE COURT:  Is Lenard Johnson still with the

           23   sheriff's department?

           24            MR. PRICE:  He is not, Your Honor.

00:02      25            THE COURT:  And do you know where he is?
```

1        MR. PRICE:  Yes.  And I represent him.  He's with

2   another law enforcement agency now.

3        THE COURT:  What do you think Johnson did?

4        MS. STEINBACK:  Well, Your Honor, just briefly to

5   bring you up to speed on what the allegations are in the

6   complaint:

7              There was a man named "Mr. Murray" found dead

8   in August of 2004.  He was a janitor at an area pool.  And

9   an investigation was conducted by the San Jacinto County

10  Sheriff's Office and the Texas Rangers who have been named

11  in this complaint.

12             Within approximately a week or so our client,

13  the Plaintiff, Richard Winfrey, Jr., was identified as a

14  person of interest, and despite the fact that there was no

15  physical evidence tying him to the crime, somehow it was

16  determined that he was one of the prime suspects.

17             And, so, Keith Pikett -- Sheriff Keith Pikett

18  was called in to conduct a dog scent lineup.  The dog scent

19  lineup was conducted and surprisingly identified Richard

20  Winfrey, Jr., as having been one of the perpetrators.  A

21  subsequent dog tracking or trailing was conducted where the

22  dogs were scented with a suspect's scent and then they

23  wandered around the community until they arrived at the

24  suspect's house.

25             During that dog scent trailing they again

1    arrived at Richard Winfrey, Jr.'s home but, it was later

2    discovered, with someone else's scent; it was not Richard

3    Winfrey, Jr., or anyone who lived in his home.  So, that was

4    considered an accident but, nonetheless, used during the

00:04    5    arrest of the investigation.

6            We also allege that there was a jailhouse

7    snitch who was coerced into identifying Richard Winfrey,

8    Jr., as one of the perpetrators of the crime.  And two and a

9    half years after the crime was committed Richard Winfrey,

00:04    10    Jr., was arrested.

11        THE COURT:  Well, tell me about the snitch.  You

12    haven't sued him.

13        MS. STEINBACK:  We have not sued him because he

14    claimed he was coerced by the investigators.  He later

00:05    15    recanted --

16        THE COURT:  So, if you're coerced you falsely

17    accuse somebody?  That's not the way I understand it works.

18    You get coerced.

19        MS. STEINBACK:  Certainly.

00:07    20            (Brief recess)

21        THE COURT:  Okay.  When did the snitch come clean?

22        MS. STEINBACK:  I don't know, Your Honor.  I'd have

23    to check on that, but the snitch recanted his testimony.

24    And I don't know.  I would have to look.  I'm not for sure.

00:08    25    It was prior to the culmination of the investigation,

1    because then there was another jailhouse snitch who came

2    forward, but I will have to check on the date for you.

3         THE COURT:  Were there other suspects?  I mean,

4    obviously, there was Winfrey and at least another person

5    because there was the second scent.

6         MR. PRICE:  Judge, there's Richard Winfrey, Sr.,

7    Richard Winfrey, Jr., and Megan Winfrey.  Senior is the

8    father of Junior and Megan.  Senior and Megan were both

9    convicted of capital murder.  And I know that Senior's case

10   was appealed and upheld by the court of appeals.  Richard,

11   Jr., the Plaintiff in this case, was determined through the

12   investigation to be a co-conspirator and actually imbedded

13   in the murder itself.  The evidence was placed before a

14   grand jury and the grand jury indicted him.  He was tried.

15        The allegation about a snitch -- and I know we

16   don't want to argue the facts here --

17        MS. STEINBACK:  Let me just say he had a five-day

18   jury trial and was acquitted in 13 minutes of the charges.

19   So, just for sake of --

20        THE COURT:  But that's a good thing, isn't it?

21        MS. STEINBACK:  Yeah.  Which is a great thing.

22   Absolutely.

23        THE COURT:  They'll rescind that if you want.

24        MS. STEINBACK:  No.  No.  I just wanted to make

25   clear that the two other co-conspirators -- alleged

1    co-conspirators were convicted.

2            THE COURT:   Well, this is a stupid question because

3    it's a murder, but what's the reason for the murder?

4            MR. PRICE:   There was a witness who overheard Megan

00:10   5    Winfrey talking to this gentleman.  She was a minor at the

6    time.  He was a janitor at the high school, Mr. Burr.  He

7    was a -- I don't know what the politically correct -- he was

8    a slow intellectual person.  But he was working as a janitor

9    there and a witness overheard her -- my understanding --

00:10   10    that overheard her say, "Go up to him and put an arm around

11    him and say, 'When are you going to take me out and spend

12    some of that money you got hidden at your house?'"  And the

13    determination was that they went there for the purpose of

14    committing a robbery and, apparently, there was some

00:11   15    evidence that --

16            THE COURT:   Okay.  Just, ordinarily, janitors -- I

17    mean, they get caught in the -- You know, the apparent theme

18    of the prosecution was that they thought he had money from

19    somewhere.

00:11   20            MR. PRICE:   Let me point out one other problem,

21    Judge, that I have -- and this is raised in our pleadings --

22    is that after Junior -- or they call him "Little Richard" --

23    was acquitted he moved for an expunction of his record and

24    the expunction was ordered.

00:11   25            My clients don't have any records anymore.

1    They were redacted or destroyed.  And, so, there, was a --

2    my understanding is there is a consolidated police report

3    that developed in the investigation of the murder.  That

4    record contains information pertaining to the investigation

00:12   5    of Senior, Megan and Junior and that those portions of that

6    record that pertain to Junior have been expunged.  And we're

7    a little bit concerned about the offensive use of the

8    expunction in this context since Mr. --

9             THE COURT:  She hasn't done anything offensive in

00:12  10    cases I have had her in.

11             MR. PRICE:  I am talking about the criminal lawyer,

12    not this lady sitting here, Judge, who has had the record

13    expunged.

14             MS. STEINBACK:  And we actually discussed this a

00:12  15    few days ago when counsel met via teleconference to discuss

16    this.

17                  You know, just as an initial matter, this was

18    an investigation into several suspects.  It was a

19    consolidated investigation.  So, you know, while I don't

00:13  20    know what records Mr. Price is talking about, because there

21    were other co-conspirators in this, I have to believe that

22    there is some records that were not destroyed regarding the

23    investigation into this case.

24             MR. PRICE:  No.  What I told you was that to the

00:13  25    extent that there are documents --

1    THE COURT:  An arrest expunction doesn't eliminate

2    the investigation file and all that stuff.

3    MR. PRICE:  Judge, we attached a copy of the order

4    of expunction to our answer and -- what I can tell you,

00:13  5    Judge, is that -- I can tell you what the San Jacinto County

6    Sheriff's Department did.  They received the order and in

7    their attempt to comply with it what they did was if they

8    found a document that pertains solely to Little Richard it

9    was destroyed.  If they found a record, a document, that had

00:14  10   information that contains just his name but it also

11   pertained to Big Richard or Megan they went through and they

12   took a marks-a-lot and blacked out information pertaining to

13   Little Richard.  That's what they did to try to comply with

14   the rule.

00:14  15   MS. STEINBACK:  Judge, just on that -- because,

16   actually, I appreciate your providing this expunction

17   order -- that wasn't what the order said to do, and it's now

18   actually an area of inquiry that we would like to

19   investigate further during discovery because -- and, as we

00:14  20   clarified with the clerk's office, this order didn't direct

21   the destruction of documents relating to the investigation

22   of this case.

23        First of all, as I already said, it was an

24   investigation into several suspects, co-conspirators, but,

00:14  25   in addition, just looking closely at Page 10 of 13, it

1    orders the Texas Department of Public Safety to notify any

2    central federal depository of the order and then tell that

3    central federal depository or any private entities who

4    received information from it to either return information to

00:15    5    the court or destroy that information.  However, for the

6    remaining agencies, including the state depositories and the

7    other agencies listed here, it says that to the extent that

8    they're going to obliterate it -- and that's only removing

9    those documents that's impracticable -- they should

00:15    10    obliterate all portions of the record or file that

11    identify -- and all in caps -- Richard Lynn Winfrey, Jr.,

12    and notify the court of any such action.

13            So, you know, as a kind of common sense

14    thinking of an expunction goes, the purpose of an expunction

00:15    15    is not to obliterate from the face of the earth any record

16    relating to an investigation.  It's for the sake of allowing

17    the person -- in this case Richard Winfrey, Jr. -- to be

18    able to apply for a job without having this murder

19    conviction on his record.

00:16    20            THE COURT:  When I was a state judge I had to hold

21    the State Board of Pardons and Paroles in contempt because

22    they had three files and they were responding to the

23    expunction orders by eliminating it from the record of

24    arrests in one file and then using the other two when they

00:16    25    wanted to check things.  And I told them to stop it and they

1  didn't.  Despite my legendary equanimity, I was irritated.

2          MR. PRICE:  Well, I am trying to be candid with the

3  Court as to what happened.

4          THE COURT:  Well, what we need, first, is what San

00:16  5  Jacinto County has.  Period.  And that would include

6  correspondence in response to this order to other agencies

7  or whatever it did, but, ordinarily, you just address the

8  DPS and the NCIC databases and, bing, it goes off.

9          MR. PRICE:  Can I ask a point of clarification,

00:17  10  Judge, and just for some further background?  The criminal

11  district attorney who prosecuted the case on behalf of the

12  state was Mr. Bill Burnet, who passed away on June 1st.  His

13  office is a -- I haven't fully researched this, Judge, but I

14  think that the criminal district attorney is a different

00:17  15  jural entity than San Jacinto County.

16          THE COURT:  The DA has -- they're state officers,

17  just like the judge.

18          MR. PRICE:  And, so, what I understand from talking

19  to --

00:17  20          THE COURT:  The county is obliged to supply

21  suitable rooms.

22          MR. PRICE:  So, what happened was that the

23  documents that San Jacinto County Sheriff's Office had, they

24  were turned over to the district attorney as a part of the

00:18  25  trial of the case.  The only thing that I am aware of -- and

1    I have tried to be very diligent --

2              THE COURT:  Who is the DA now?

3              MR. PRICE:  He is a first assistant, Jonathan Petix

4    who is acting as criminal district attorney until the office

00:18    5    is filled.  My understanding is that Mr. Petix, because the

6    district attorney's office was also included in the order,

7    did a similar thing, that they -- Well, I don't want to

8    speak for Mr. Petix.  I know that they either destroyed the

9    documents that dealt solely with Junior and redacted

00:19   10    documents that had his name in it that were otherwise -- and

11    whatever they maintained they returned to the district clerk

12    pursuant to the order and that all -- that the trial record,

13    the district attorney's file and all the trial evidence is

14    under seal at the district clerk's office under order of

00:19   15    Judge Trapp.

16              THE COURT:  Good.  But what there is that is in

17    that file that pertains to Little Richard I have no idea.

18    It's not available to me.

19                   Were they tried separately?

00:19   20              MR. PRICE:  Yes.  There were three separate trials.

21              MS. STEINBACK:  Three separate trials.

22              THE COURT:  So, his trial record should be mostly

23    about him.  Or she'd argue it wasn't about anybody.

24              MR. MORSE:  Judge, I think we should also point out

00:20   25    the other two defendants who were convicted and there was --

```
         1    I think the court of appeals affirmed -- but the court of

         2    criminal appeals has granted a petition for discretionary

         3    review on Senior's case is my understanding; so, they have

         4    taken that case and it's before them now.

00:20    5              MR. PRICE:  I believe that's right, Judge.  I don't

         6    know about Megan.  There is a published opinion on the

         7    appeal of Senior's trial.

         8              THE COURT:  Okay.  But we just have to go ahead.

         9    They're obviously not going to do anything about Junior's

00:20   10    case.  It's over.  So, what we need --

        11              Do you need anything out of the trial record?

        12              MS. STEINBACK:  We'd love everything we can get out

        13    of the trial record.  And, Judge, we do have some documents

        14    that were provided to us by Junior's criminal defense

00:21   15    attorney and, you know, we would, of course --

        16              THE COURT:  Who is that?

        17              MS. STEINBACK:  Her name is Shirley Baccus Lobel.

        18    So, you know, to the extent that the trial record is

        19    deficient in any way or San Jacinto County records are

00:21   20    deficient in any way, you know, we can pool it all together

        21    so that we have as complete a record as possible to conduct

        22    discovery.

        23              THE COURT:  But the trial record is not the problem

        24    here.  The problem here is what happened in the

00:21   25    preparation --
```

```
 1            MS. STEINBACK:  Correct.
 2            THE COURT:  -- if it is a problem.  So, what do you
 3   think the Rangers did that might have any --
 4            MS. STEINBACK:  Well, it's my understanding, Judge,
 5   that the Rangers were in charge of the investigation.  And,
 6   again, this is information -- I can't tell you exactly
 7   what --
 8            THE COURT:  If they were there and they acted
 9   like --
10            MS. STEINBACK:  -- exactly, what each specific
11   defendant did.
12            THE COURT:  They're very good and they don't suffer
13   fools gladly.
14            MS. STEINBACK:  But all of these claims, as you
15   will see in our complaint -- each claim is pled against each
16   defendant acting individually and jointly in the conspiracy
17   and we do have a conspiracy claim.
18            THE COURT:  I know, but the conspiracy claim has to
19   be to do something, and a conspiracy to be stupid is not
20   actionable.
21            MS. STEINBACK:  Correct.  We're not alleging
22   negligence here.
23            THE COURT:  Well, but you have to willfully,
24   knowingly and intentionally join a conspiracy to do
25   whatever -- I mean, the problem is, so far what I have
```

00:22   5
00:22   10
00:22   15
00:22   20
00:23   25

1   heard, is we're back to Pikett and his unreliable theory of

2   dogs and underwear.

3           MS. STEINBACK:  Well, it's not just Pikett, though

4   Pikett is certainly a component of it.  We are alleging in

00:23   5   this case, as in the other case, that it was well known that

6   these dog scent lineups were a fraud and that they were used

7   knowingly for the purpose of implicating a suspect.  In this

8   case they had identified a suspect, Richard Winfrey, Jr.

9   They didn't have anything attaching him to the crime other

00:23  10   than --

11           THE COURT:  -- his family.

12           MS. STEINBACK:  Correct.  Well, they identified

13   three suspects and they didn't have any physical evidence

14   tying Richard --

00:23  15           THE COURT:  They don't have to have physical

16   evidence.  I'm sorry.  This is not -- what is that?  CSI

17   Miami?  Prosecutors live in fear today that the jury is

18   going to want to know why they didn't do spectrographic

19   testing of shoe soles that they found in the dump or

00:24  20   something because they're always doing that.

21               But what we have is an investigation by the

22   San Jacinto County Sheriff assisted by the Rangers,

23   apparently.

24           MR. PRICE:  It's the other way around, Judge.  It's

00:24  25   the Rangers assisted by the San Jacinto County Sheriff.

```
         1              THE COURT:  Why were the Rangers involved?
         2              MR. PRICE:  They were called in on the day the body
         3    was discovered.  They were there that day.
         4              THE COURT:  Who called them?
00:24    5              MR. PRICE:  Sheriff Rogers.  Yes.  That's right.
         6              THE COURT:  Somebody has got to call them.
         7              MR. PRICE:  I am just trying to remember if it
         8    was -- I believe it was Sheriff Rogers.
         9              THE COURT:  All right.  In the process of that
00:25   10    investigation they used Pikett's dog business.  Half the
        11    time it identified Winfrey.  Half the time it didn't.
        12    Right?
        13              MS. STEINBACK:  No.  It consistently identified
        14    Winfrey even when the scent was not --
00:25   15              THE COURT:  No.  That's a fifty-fifty.  We know
        16    that one of the things was a misidentification.
        17              MS. STEINBACK:  Oh.  Sure.
        18              THE COURT:  In one it identified him.  The other it
        19    identified him as somebody entirely different.
00:25   20              MS. STEINBACK:  Correct.
        21              THE COURT:  So, I call that not an identification.
        22              MS. STEINBACK:  Okay.
        23              THE COURT:  When the victim says it was a 6'3"
        24    black man and they identify him in the lineup, there's
00:25   25    something wrong, you know.
```

1          MS. STEINBACK:  Right.

2          THE COURT:  So, that's what we have.

3          And you say they had no other evidence, but we

4    can get, presumably, what was presented to the grand jury.

00:26    5    Right?

6          MR. PRICE:  Well, I don't think that I'm in the

7    position -- I don't think that I have the power to compel

8    that, Judge.

9          THE COURT:  Well, I do.  That's not a problem.  I'm

00:26   10    not worried about any of these people.

11          So, the information that produced the

12    indictment is documented.  Isn't that what we have to go on?

13    Because it doesn't matter how many stupid things they did if

14    they couldn't use them.  Let's assume that Duff and Huff got

00:26   15    out an Ouija board.  I don't think that's very reliable, but

16    if they don't show the Ouija board evidence to the grand

17    jury it cannot have been a factor in the indictment.  Right?

18          MS. STEINBACK:  Sure.

19          THE COURT:  So, I think we need to know is what the

00:27   20    district attorney presented to the grand jury and work back

21    from there to see whether any of that was something that was

22    done illegally.  Doesn't that make sense?

23          MS. STEINBACK:  Sure.

24          THE COURT:  You just want to go home.

00:27   25          MR. MORSE:  I'm enjoying it.

1           THE COURT:  All right.  Do you want to talk to

2      the -- Doesn't the district clerk have the Ranger records?

3           MR. PRICE:  Beg your pardon, Judge?

4           THE COURT:  The district clerk has --

00:27  5           MR. PRICE:  I assume that, but I have not talked

6      with her to know what in fact they have.  What she has told

7      me is that anything that she received pursuant to the order

8      of expunction she's got locked in a cabinet where nobody can

9      get to it.

00:28  10           THE COURT:  All right.  Well, I think, then, I need

11     to order a subpoena to the district clerk for those things

12     gathered in response to the expunction order in the original

13     case materials.

14              Where is all the records for the other two

00:28  15     Winfreys?

16           MR. PRICE:  I know that -- I say that.  I believe

17     that Mr. Petix has a big rolling cart that has the physical

18     evidence that was used in the trial -- well, the physical

19     evidence, the transcripts and other matters that were used

00:29  20     in the trial of Senior and Megan.  I have -- The only

21     knowledge that I have of the contents is what I can glean

22     from the court of appeals opinion affirming the conviction

23     of Richard Sr., and it talks in some great detail about the

24     number of witnesses that were interviewed, the number of

00:29  25     suspects and -- There was a lot of work done, Judge, to

1   pursue other suspects as well.

2        THE COURT:  All right.  Well, do you want to look

3   at all that stuff?

4        MS. STEINBACK:  You know, part of our allegations

00:29   5   for the reckless investigation claim is that there wasn't

6   work done to pursue other suspects; and, so, that will be a

7   part of our discovery, Judge.

8        THE COURT:  Well, there was because they got

9   convictions on two other people.  That they didn't do

00:30   10   anything other than pick on Little Richard is clearly wrong.

11        MS. STEINBACK:  Sure.  But, I mean, aside from the

12   Winfrey family, that's correct.

13        THE COURT:  Why would they have to go bug the

14   Fergusons up the road from the Winfreys if they think the

00:30   15   Winfreys did it?

16        MS. STEINBACK:  Because there were other suspects

17   who we allege had motives to commit the crime far more than

18   the evidence that was presented against the Winfreys.

19        THE COURT:  Except the evidence was sufficient

00:30   20   against two of them.  So, how can that be vexatious

21   prosecution and they get convictions and an acquittal

22   showing that jurors in San Jacinto County are not hand

23   maidens to the prosecution?

24        MS. STEINBACK:  And this may be a little bit beyond

00:30   25   my expertise and perhaps you're more familiar with this,

| | |
|---|---|
| 1 | Mr. Morse, because you are more involved in the cases.  But |
| 2 | it's my understanding that the other two Winfreys are also |
| 3 | claiming innocence and -- |
| 4 | THE COURT:  Ma'am, Texas has got 165,000 people all |
| 00:31 5 | of whom are claiming innocence. |
| 6 | MS. STEINBACK:  And as we see on the front pages of |
| 7 | the *Houston Chronicle* some of them are innocent. |
| 8 | THE COURT:  Some of them might be.  But a claim of |
| 9 | innocence is not sufficient to do anything.  They claim they |
| 00:31 10 | were innocent all the way through the trial.  The jury came |
| 11 | to a different conclusion.  At least on one of them the |
| 12 | courts of appeals has -- not that I have any stake in the |
| 13 | courts of appeal.  Pikett's dog sniffing is probably more |
| 14 | reliable than courts of appeals.  But that's where it goes. |
| 00:31 15 | So, whether they're right or wrong I don't know, but it |
| 16 | cannot have been wrong to focus on the Winfrey family with |
| 17 | the information that we have now.  You just can't.  Is there |
| 18 | another Winfrey out there? |
| 19 | MR. PRICE:  Not that I know of. |
| 00:32 20 | MS. STEINBACK:  There is one, the mother, and |
| 21 | another sister who is now deceased, but -- |
| 22 | THE COURT:  So, Megan had a sister at the time? |
| 23 | MS. STEINBACK:  That's correct. |
| 24 | THE COURT:  Did they investigate the mother and the |
| 00:32 25 | other sister? |

1        MS. STEINBACK:  I believe the mother and not the

2   sister.

3        THE COURT:  How old is the sister?

4        MS. STEINBACK:  I'm not entirely sure.  I think she

00:32   5   was in her early 20s.

6        THE COURT:  She might not have been there.

7        MS. STEINBACK:  She was -- The whole family lived

8   together is my understanding.

9        THE COURT:  What else do you think they did wrong?

00:33  10        MS. STEINBACK:  Well, we allege that they used

11   testimony that they knew was false, but they coerced a

12   jailhouse snitch into implicating Richard Winfrey, Jr.

13        THE COURT:  Do you really think that all nine or

14   ten of these people you have named got together and beat on

00:33  15   the courthouse snitch?

16        MS. STEINBACK:  I don't know which of them did,

17   Your Honor.

18        THE COURT:  You don't know that anybody did.

19        MS. STEINBACK:  Well, according to testimony he

00:33  20   provided and letters that he wrote to Richard Winfrey, Jr.'s

21   mother he alleged that they did and he recanted.

22        THE COURT:  And what was he in jail for?

23        MS. STEINBACK:  I can't tell you that right now,

24   Your Honor, but I can --

00:33  25        THE COURT:  Do you have his criminal history?

1    MS. STEINBACK:  I believe we do.  I just don't know

2  it off the top of my head.

3    THE COURT:  Get it to me.

4    MR. PRICE:  Well, Judge, there's a problem there

00:34  5  and I'll be glad to do whatever you tell me to do.  The

6  problem that I have with the allegation -- and, again, I am

7  limited to the documentation that's available to me and that

8  documentation -- in fact, there are two informants whose

9  names surface in connection with the investigation of

00:34  10  Mr. Burr's murder.  One was Richard, Jr. -- I mean, Richard

11  Sr., was in jail for another offense and then later got out

12  of jail before the murder of Mr. Burr.

13    After the murder -- and, again, I am doing my

14  best -- I believe that what I am telling you is correct,

00:34  15  Judge, but -- After he got out of jail it's my understanding

16  that someone who had been in a cell with Senior during his

17  pre-offense incarceration had -- Senior had said something

18  to the effect that he had killed Murray Burr and that his

19  children had -- There was testimony that from time to time

00:35  20  the children would go visit Murray Burr at his home before

21  the offense.  And this jailhouse informant stated that while

22  he had been in jail with Richard, Sr., Richard, Sr., said

23  that he had killed Murray Burr and his children had opened

24  the door for him to get in.  I believe that's what it says.

00:35  25  I should have brought -- I have got the redacted police

          1    report, but a statement was given.  That person called from

          2    the jail and he said, "I have something that you need to

          3    know about."  Nobody went to him to find it.  He made a

          4    voluntary --

00:36     5              THE COURT:  Okay.

          6              MR. PRICE:  Then after that there is --

          7              THE COURT:  So, his roommate volunteered it?

          8              MR. PRICE:  Yes.  And then there was another

          9    informant that came forward later on that I believe

00:36    10    testified that Junior had told him something about Junior's

         11    own involvement.  I believe that that statement may have not

         12    been allowed into evidence at the trial.

         13                   Am I getting this right, Randy?

         14                   Or, Shanna, do you know that?

00:36    15                   I believe that that's what the consolidated

         16    peace report shows or maybe someone told me that, that

         17    that's one of the reasons that Winfrey was acquitted, was

         18    because a statement that was allegedly made by Junior to

         19    someone else was not allowed in evidence at the trial.

00:37    20              THE COURT:  He was acquitted because the evidence

         21    didn't convince the jury.  If the judge didn't let it in it

         22    probably shouldn't have come in.  Now, I don't know who this

         23    other person was.

         24                   Why do you think that the information was

00:37    25    coerced?

1          MS. STEINBACK:  Well, one, because our client

2    didn't do the murder for which he was charged.

3          THE COURT:  Well, that doesn't mean anybody beat on

4    the courthouse liar.

00:37    5          MS. STEINBACK:  Sure.  And, second, because the

6    individual who had given the testimony that he later

7    recanted said it had been coerced.  And I believe, though

8    I'm not sure, so I will go back and look for you -- I

9    believe he was involved -- I don't know the extent of his

00:37   10    criminal history or what he was in jail for at the time, but

11    I believe it has something to do with a custody dispute.

12    So, again, I will look into that for you.

13          MR. PRICE:  This is all complete news to me, Judge.

14          THE COURT:  Do you say the snitch wrote the mother?

00:38   15          MS. STEINBACK:  I believe that's true.

16          THE COURT:  Do you have that letter?

17          MS. STEINBACK:  I'm not sure.

18          THE COURT:  Get it, I mean, if it exists -- since

19    she's got to produce everything.  Everybody in the family

00:38   20    has to produce everything they have that has anything to do

21    with the three cases, because I don't want the mother

22    deciding, 'Well, this has to do with my husband's case and

23    not my son's case.'

24          MS. STEINBACK:  Sure.

00:38   25          THE COURT:  So, anything, especially about this

1   guy.  I don't know that y'all are talking about the same

2   person.

3            MR. PRICE:  Nor do I, Judge.

4            MS. STEINBACK:  We may not be, Judge.

00:38  5         THE COURT:  Yeah.  So, can you get his criminal

6   history or do I need to order --

7            MR. PRICE:  If she will tell me -- Well, I don't

8   know whether she will tell me --

9            THE COURT:  No.  Your guy, the one you just

00:38  10  described.

11           MR. PRICE:  Well, I don't know his name.  The

12  second guy?

13           THE COURT:  Well, I know, but you can look it up.

14           MR. PRICE:  If it's still in the record.  I think I

00:39  15  can, Judge.

16           THE COURT:  It has to be in the record.

17           MR. PRICE:  The record is sealed.

18           THE COURT:  Well, it's not going to be sealed for

19  long.

00:39  20           MR. PRICE:  Right.

21           THE COURT:  They didn't discuss this business --

22  The first guy you mentioned ratted out the father.

23           MR. PRICE:  That's right.  And I can identify him.

24           THE COURT:  Get his criminal history, who he is,

00:39  25  his resume, whatever you have.

1          And then for the second guy do what you can to

2    find out who that was.  I mean, that he snitched should be

3    in his criminal records, not in Winfrey's.  It should be in

4    both.  The guy who implicated the son -- It should be both

00:39    5    in the son's file and in the other guy's because he was a

6    defendant in something.  So, wouldn't you put it in both

7    cases' investigatory file?

8          MR. PRICE:  I will find out what I can about the

9    second guy, Judge.

00:40   10          THE COURT:  The first one, too.

11          MR. PRICE:  Right.

12          THE COURT:  And then we need -- if there is a

13    document, they need it immediately and they'll find out

14    whatever they can about that guy.  Because there may be a

00:40   15    third snitch.  Jailhouses are full of snitches.

16          And the same theory against Fort Bend and the

17    Fort Bend Sheriff, that they shouldn't let Pikett do what he

18    does?

19          MS. STEINBACK:  Correct, Your Honor.

00:41   20          And just so you know the procedural posture of

21    the case, both Fort Bend County and the Fort Bend County

22    defendants and the San Jacinto County and their defendants

23    have answered the complaint.  The Texas Rangers have filed a

24    motion to dismiss which is fairly similar to the one that

00:41   25    you have already ruled on and rejected in the other dog

1   sniff case that we have, *Curtis*.  It's --

2           THE COURT:  There were no Rangers in that one.

3           MS. STEINBACK:  That's correct.  But it's talking

4   about the pleading standard for qualified immunity.  I think

00:41   5   it's actually slightly different.  And we can discuss it

6   here if you'd like or we can submit --

7           THE COURT:  Is it any good?

8           MS. MOLINARE:  I think it's pretty good.  I don't

9   know that it's my best.

00:42   10          THE COURT:  The intentional infliction of emotional

11  distress is subsumed in malicious prosecution.  That's one

12  of the damages in malicious prosecution.  There's no

13  independent claim.

14          And the abuse of process and malicious

00:43   15  prosecution is essentially the same.  The conspiracy was to

16  do those things; so, basically, we have got a malicious

17  prosecution case.

18          Is this an F7 on your computer (indicating)?

19          MS. MOLINARE:  No.

00:43   20          MR. PRICE:  Well, Judge, since you mentioned

21  "seven", although we haven't filed a motion to dismiss and

22  have not formally filed a motion for a Rule 7 reply -- you

23  know, I won't speak for Randy, but I am in the same boat, is

24  that allegedly all defendants did everything and --

00:43   25          THE COURT:  That's a problem.

1          The claim under 1983 is essentially malicious

2    prosecution.  It is a violation of due process to paying

3    people on faked evidence.  I think that's clearly

4    established.

00:44   5          Don't you?

6          MS. MOLINARE:  That malicious prosecution exists as

7    a claim?

8          THE COURT:  That under the Constitution it's a

9    violation of due process to fake evidence and hang somebody.

00:44   10          MS. MOLINARE:  Yes.  I would agree.

11          THE COURT:  I think it's amazing the Supreme Court

12   hasn't ruled that police officers only are responsible for

13   clearly established constitutional principles, but everybody

14   else is responsible for all the rules, clearly established

00:45   15   or not.

16          So, I think we have a tort, malicious

17   prosecution and the Constitution, government irregularity

18   claim.

19          The trouble is I don't know what the Rangers

00:45   20   did exactly, because it makes a big difference on whether

21   they just hired a goofball or they said, 'We can't find

22   anything; so, let's hire this lying scum bag.'  Those are

23   different concepts.

24          MS. STEINBACK:  Sure.

00:45   25          THE COURT:  And I don't think it's clear from the

1    complaint that the Rangers -- what they did that would

2    amount to a willful, intentional transition into arbitrary

3    government.

4         MS. STEINBACK:  Like I say, just to quickly

00:46  5    respond, Your Honor, that it's really no different than the

6    other case we have before you.  I mean, we know that this

7    was a case that -- or this investigation was -- whether it

8    was led by the Rangers and had San Jacinto County Sheriff's

9    Office employees working alongside them or vice versa, we

00:46  10    allege that they knew that the lineup was a fraud and that

11    they --

12         THE COURT:  I understand your position about Pikett

13    and -- The fact that it turns out to be bad is not the same

14    thing as violating the Constitution.  And, of course, you're

00:46  15    not supplying me the data on all the times Pikett has found

16    the actual culprit.  And if you took lie detectors, my guess

17    is you'd have a 35, 40 percent failure rate even properly

18    administered, which most of them aren't.  It just isn't

19    exact.

00:47  20         It's got witnesses and all the rest of the

21    stuff.  So, there's got to be more than you disagree with

22    the investigative technique.  I'm not going to assume that

23    it is so deficient that its mere use is equivalent to a

24    railroading.  It might be.

00:47  25         MS. STEINBACK:  Sure.  And I think I understand

1    what you --

2           THE COURT:  And then you have got to get who hired

3    Pikett, who did supervise him.  The fact that the Rangers

4    were in charge in the investigation may not mean they were

00:48  5    in charge with the administration of them.  Many times he

6    said, 'Go get all the information and do all this stuff and

7    let us know.  We're going to go do something else.'  You

8    know there are not many of them, but there are a lot of

9    deputy sheriffs.

00:48  10          And I need to know....  What's his name?  So,

11   is it your understanding that Lenard Johnson was the actual

12   person who did the work there at San Jacinto County?

13          MS. STEINBACK:  I believe that Lenard Johnson and

14   Lacy Rogers were the two individuals that we know thus far,

00:49  15   but there may be more, who were involved in the

16   investigation.

17          THE COURT:  If there were others why aren't they on

18   there?

19          MS. STEINBACK:  We put "as yet unknown".

00:49  20          THE COURT:  I know and that doesn't help me.

21   Shortly after Bevins sued four unknown DEA agents, they knew

22   who they were.  The DEA just wouldn't tell them in advance.

23   But your client went through the whole investigation.  He

24   knows who he talked to.  And I am going to make them give

00:49  25   you the records.  I am just worried about what Lenard

1   Johnson did.  You named him, so you must know what he did.

2   What did he do?

3        MS. STEINBACK:  Sure.  Well, you know, just to be

4   very candid and because we haven't had full discovery yet, I

00:49   5   don't know how many --

6        THE COURT:  Why did you name him?

7        MS. STEINBACK:  Because he and Lacy Rogers were

8   both involved.  We know that they spoke with Richard

9   Winfrey, Jr., and that they were involved in the

00:50   10   investigation.

11        THE COURT:  But that doesn't make them responsible

12   for violating his rights.  The newspaper reporters talked to

13   Mr. Winfrey, didn't they?  Are they part of the conspiracy?

14        MS. STEINBACK:  But they weren't involved in the

00:50   15   investigation that resulted in his arrest.

16        THE COURT:  But "involved" doesn't do it, ma'am.

17   It's got to be they did something wrong.

18        MS. STEINBACK:  Sure.  And I will just point

19   here --

00:50   20        THE COURT:  You know, if Winfrey jaywalked there

21   would probably be seven officers show up for the arrest

22   because, you know, the morning donuts have all been sold out

23   and there's nothing else going on in town.

24        MR. PRICE:  Judge, could I just also add that she

00:50   25   says that they haven't done discovery, but there was a

1    criminal proceeding.  He had a lawyer.  They discovered --

2           THE COURT:  Criminal file.

3           MS. STEINBACK:  Sure.  I mean, that's how we have

4    these names and, so --

00:51    5           THE COURT:  I know.  But those are names, not acts.

6           MS. STEINBACK:  Right.  And, Your Honor, I would

7    just point you to -- just to be clear, because I don't want

8    anybody to be mistaken.  This isn't a case where we're

9    saying all these people are culpable for hiring this person

00:51   10    who conducted this lineup.  I mean, you know, in Plaintiff's

11    complaint, paragraph 4, "Following the dog scent lineup," it

12    says, "in an attempt to ensure that Plaintiff was convicted

13    despite his innocence, Defendants fabricated evidence...to

14    corroborate the sham findings of the dog scent lineups."

00:51   15           MR. PRICE:  And that's a conclusory pleading.

16           THE COURT:  I'd like to pretend that I'm in charge

17    here.  I need my Boy Scouts back.

18           MS. STEINBACK:  We heard about that.

19           THE COURT: All right.  The problem with it --

00:52   20    Anyway, that is a generalization.  It's like saying they

21    violated his due process.  What evidence did they fabricate?

22           MS. STEINBACK:  They coerced testimony --

23           THE COURT:  No.  Fabricate evidence.  I understand

24    the thing about the snitch, but what did they fabricate?

00:52   25           MS. STEINBACK:  Well, that is presenting fabricated

1    evidence.

2           THE COURT:  I understand, but I know about that.

3    So, is that what this is about?

4           MS. STEINBACK:  Sure.  This is about using --

00:52  5     THE COURT:  Okay.  Now, earlier you told me you

6    didn't know who talked the weasel into being a bigger

7    weasel, who turned out to be an unreliable weasel.  You

8    know, Huey long, when he was governor, said, "An honest

9    politician in Louisiana is one who when bought stays

00:52  10   bought."

11          So, he didn't stay coerced.  Can you explain

12   that?

13          MS. STEINBACK:  Well, he did recant.

14          THE COURT:  No.  If he was under fear of bodily

00:53  15   injury or something why did that fear go away?

16          MS. STEINBACK:  I don't know, Your Honor.

17          THE COURT:  So, he's told two stories and you want

18   me to believe one and not the other.  Why should we believe

19   your choice instead of his choice?  That's the trouble with

00:53  20   liars.  And he can be lying both times.  He might not have

21   known what he said, but he might have known that Winfrey did

22   it.  I don't know.

23          So, who coerced him?  You don't know.  All we

24   have is an unsworn statement by a guest of San Jacinto

00:53  25   County.

1        MS. STEINBACK:  We may have more, Your Honor.  I

2   don't know what the police records reflect, so I --

3        MR. PRICE:  He wasn't even a guest of San Jacinto

4   County, Judge.  I believe that the first one was in

00:54   5   Montgomery County and I think the other one may have been at

6   TDC.

7        THE COURT:  All right.  I mean, that's the trouble

8   with the motion to dismiss business, is she has a legitimate

9   problem because she's dealing with governments that have

00:54   10   schizophrenic authority; and, so, San Jacinto County is not

11   responsible for what happens at Montgomery County Jail

12   unless they go down there and beat it out of him.  If it

13   happened in the state prison they'd have no clue.

14        So, your client has to get you everything he

00:55   15   knows about every conversation with that guy and get to all

16   of them and then you find out who it is, because it may be

17   he never was in prison.

18        But, as we sit here today, you do not know

19   that the Rangers coerced anybody to do anything?

00:55   20        MS. STEINBACK:  I apologize, Judge.  Off the top of

21   my head, I just don't remember who spoke with the person

22   that we are alleging was coerced into giving false testimony

23   against Richard Winfrey, Jr.

24        THE COURT:  Who says he was "talked to by".

00:55   25        MS. STEINBACK:  Correct.  We are alleging.

1    THE COURT:  I want to know -- Your client has been

2  in contact with this guy and he knows who he says he talked

3  to.  Right?

4    MS. STEINBACK:  Sure.

00:56    5    THE COURT:  And I don't believe he says that all

6  these guys came to him.

7    MS. STEINBACK:  And, Judge, you know, just to

8  remind you, the procedural posture of this, the Defendants

9  are fully within their capability to admit or deny these

00:56  10  allegations and, in fact, these two sets of defendants have.

11  So, to the extent that I can't tell you right now whether it

12  was Defendants Huff and Duff or whether it was Defendants

13  Johnson and Rogers, presumably those defendants, since it

14  didn't happen so long ago, are able to recall whether or not

00:56  15  they --

16    THE COURT:  I understand, but Winfrey is bringing

17  the claim.

18    MS. STEINBACK: Right.

19    THE COURT:  Their job is to respond to his

00:57  20  assertions, not to make his case for him.  They don't work

21  for Winfrey.

22    MS. STEINBACK:  Sure.  Oh, absolutely.  And I'm not

23  asking them -- Yeah, I don't presume any of them will admit

24  to it, but they can then deny and then we continue on from

00:57  25  there.

1          THE COURT:  Every serious police brutality case I

2     have had has been cracked because of an honest policeman who

3     wouldn't follow the story.

4          MS. STEINBACK:  We need more like that in Chicago,

00:57    5     Your Honor.

6          THE COURT:  There are many levels of integrity that

7     could be added to Chicago.

8               All right.  But let's get -- I mean, since

9     we're dealing from the secret records -- so are you -- I

00:57   10     don't want to rule on the motions yet.  I want us to figure

11     out -- You know, it's her job to see if there's a case from

12     the facts.  She's got a client who says that he says he was

13     coerced and she already knows about Pikett, and she don't

14     like him.  So, we're going to -- Pikett is easier.

00:58   15               So, let's get -- Do you have any idea on

16     Winfrey's trial and grand jury -- how bulky it is?

17          MR. PRICE:  I know that -- I saw the pushcart that

18     had some of the trial evidence for Senior's trial and it was

19     like one of these two-level deals and it's -- you know, it

00:58   20     was a big cart.  There was a lot of documents on it.  They

21     were in big cardboard boxes, not banker boxes.  There were

22     about four of those.

23               Judge, can I ask a question?

24          THE COURT:  Okay.  I'm just -- Could you just

00:59   25     gather all at your office?  Because it's too much,

 1   reasonably.

 2           MS. STEINBACK:  Sure.

 3           MR. PRICE:  It's not in the County's possession,

 4   Judge.  It's in the DA's possession.  Now, we could

00:59   5   probably --

 6           THE COURT:  I am going to order him to produce it.

 7           MR. PRICE:  Can we have it produced in his office?

 8           THE COURT:  Nobody wants to go up there.

 9           MR. PRICE:  He won't even let me take his original

00:59  10   open records responses to things, Judge.  He says, "If you

11   want to look at it you come up here."  Now, I know I don't

12   have the authority that you have down here.

13           THE COURT:  Maybe they would want to come down here

14   and talk to me.  I don't know.

00:59  15           MR. PRICE:  I think he's new in this office and he

16   is trying to be very conscientious.

17           THE COURT:  Conscientious and recalcitrant are not

18   the same thing.

19           MR. PRICE:  That's true.

01:00  20           THE COURT:  Prosecution is the public record.

21               The daughter and the father -- there is no

22   reason for him not to produce that.

23           MR. PRICE:  Well, I'm not a criminal defense

24   lawyer, Judge.  Winfrey's case -- Senior's case is pending

01:00  25   before the court of criminal appeals; so, it's an active and

1    ongoing matter.  So, all that stuff that was in the boxes

2    is --

3              THE COURT:  Active and ongoing.

4              MR. PRICE:  Active and ongoing lawsuit, not

01:00   5    investigation.

6              THE COURT:  The record that is before the court of

7    criminal appeals has already been done and they don't care.

8    But if he doesn't want to produce the original so that it

9    can be in your office, in your custody and anybody can go

01:00  10    look at it and designate what they want copied, then I will

11    just order him to copy it for everybody, if he thinks he

12    needs to maintain custody of all those boxes and things.  I

13    don't think Steinback wants to see anybody's shoes or

14    anything.

01:01  15              MR. PRICE:  If it's stuff that's in an evidence bag

16    that it's sealed and if it's something that the court of

17    criminal appeals should kick it back and it has to be

18    retried --

19              THE COURT:  Physical evidence.

01:01  20              MS. STEINBACK:  If it could just be made available

21    to us we could come and view it.

22              THE COURT:  But that stuff, they can just take

23    pictures of it.

24              MS. STEINBACK:  Sure.  Yeah.  Exactly.

01:01  25              THE COURT:  Muddy shoes and shell casings and stuff

1  like that, just take pictures of that, because it will be

2  discussed in some papers, and then copy the papers.

3        MR. PRICE:  Okay.  So, you want him --

4        THE COURT:  No.  I want her to send the

01:01  5  photographs, whatever it is they're talking about, because

6  it just makes it more interesting.

7        MR. PRICE:  Oh.  So, they can photograph --

8        THE COURT: -- anything in a bag.

9        MR. PRICE:  -- in a bag and leave the original

01:01 10  stuff there and then just have the photos here?  Okay.

11        THE COURT:  And then he needs to copy all the

12  documents that we need.  The district clerk -- I don't know

13  what she wants to do about that, but....  Were there

14  physical exhibits at Winfrey's trial?

01:02 15        MR. PRICE:  Oh, yeah.  Well, I know there were at

16  Senior's trial.

17        THE COURT:  No.  In Junior's.  I mean, why don't

18  they go by "Lynn"?  That's a perfectly good name.  That's

19  just crazy.

01:02 20        MR. PRICE:  I do not know -- I have no idea what

21  the physical evidence is for Junior's trial.

22        THE COURT:  Well, find out.  She'll talk to you,

23  won't she?

24        MR. PRICE:  Oh, yeah.  Absolutely.

01:02 25        THE COURT:  A lot of people don't want to talk to

1    you.

2            MR. PRICE:  My little brother for sure.

3            THE COURT:  Little brothers are great people.

4                Talk to her and see if there are bags of stuff

01:02  5    and then we'll just take pictures of them and then,

6    otherwise, we'll get at least three copies and whatever the

7    paper is.  But, most of all, I want young Winfrey's grand

8    jury.  That seems to me to be the key of a wrongful

9    prosecution.

01:03  10           MR. PRICE:  Judge, can I just ask a question about

11   that?  Because this is obviously going to be -- is going to

12   involve some costs.  And I understand Plaintiff's need to

13   have some information before responding to a motion to

14   dismiss.

01:03  15               I guess, from my client's perspective and

16   especially in cases against the individual peace officers, I

17   mean, you know, there's no pattern, practice or custom here

18   and there is none alleged.  But with regard to the

19   "individual capacity" claims I believe the evidence is that

01:03  20   none of my clients participated in the collection of dog

21   scent evidence --

22           THE COURT:  And I am going to just assume that.

23   She just needs to know that.  It's impossible to tell when

24   people say, 'We have ongoing investigations and it's been

01:04  25   sealed and we can't do this.'  Somebody has got -- She's

1    talked to the people who will talk to her.  And, again, not

2    many people want to talk to her either.  And, so, having

3    done that, I am going to let her have a little

4    information --

01:04    5          MR. PRICE:  Well, what I was going to suggest,

6    Judge, is I have got -- as I told you, the murder

7    investigation was a consolidated report and, so, I have got

8    a stack of documents about this thick that is the

9    investigative report.  I assume that she already has it --

01:04    10          THE COURT:  Do you have it?

11          MR. PRICE:  -- because he was tried.  He had a

12    lawyer.  So, I don't know why this is a mystery, why she's

13    claiming that she doesn't have this information when he

14    tried and she was entitled to discovery.

01:04    15          THE COURT:  Do you?

16          MS. STEINBACK:  Well, first, we're not their

17    criminal defense attorney.

18          THE COURT:  I know, but it's the same person.

19          MS. STEINBACK:  Oh.  Sure.  Sure.  Sure.

01:05    20    Absolutely.

21          THE COURT:  Winfrey has to -- He was there.  The

22    law requires him to be there.  He had a lawyer.  He has a

23    lawyer now.  If the lawyers don't talk it's Winfrey's

24    problem.

01:05    25          MS. STEINBACK:  Sure.  No.  But we do have

1   documents.

2            MR. PRICE:  And what I will say, Judge, is that

3   there are supplemental reports in the consolidated police

4   report that say who did what.  This isn't a mystery.  I'll

01:05   5   be glad to give it to her again, but can I do that before we

6   do all this other stuff about --

7            THE COURT:  Yes.  All right.  Let's start -- And

8   give it to the State because it doesn't --

9            MR. PRICE:  I have already got it scanned, Judge.

01:05   10   I can send it to them on a CD.

11            THE COURT:  But you retain the T-shirt and poster

12   rights to your CD.

13                 Get that to them.  You've got ten days to tell

14   me whether you still need -- I mean, I don't know that that

01:06   15   will help because we don't know how much of that was

16   presented to the grand jury.

17            MR. PRICE:  But it will show, Judge, lack of

18   personal involvement.

19            THE COURT:  I understand what you think it shows.

01:06   20   I am going to let them read it and hope that I don't have

21   to.

22                 Get it to everybody, and then after 10 days

23   they'll let me know whether they think they still need the

24   trial records, the grand jury record or anything else they

01:06   25   can think of.

1          MR. PRICE:  And just to be -- so that I'm not later

2     understood to have said something -- Again, this set of

3     documents I have is the consolidated report that has all

4     mention of Richard Winfrey, Jr., marked out in black ink,

01:07   5     and it's my further understanding that if there are

6     documents in that that pertain specifically to Richard only,

7     that those are not in there, that they have been removed and

8     obliterated, according to their understanding.  But I

9     believe that the documents that talk about the conduct of

01:07   10    the dog scent lineup and trail and then the collection of

11    evidence -- those are in documents that were pertinent to

12    both cases.  So, you're going to find black marks where her

13    client's name existed.

14          MS. STEINBACK:  That's fine, Your Honor.  We'll

01:07   15    just assume that wherever there is a redaction mark that

16    says "Richard Winfrey, Jr."

17          THE COURT:  His criminal lawyer should not have a

18    redacted copy.

19          MS. STEINBACK:  Right.

01:07   20          THE COURT:  So, now you can compare.

21          MS. STEINBACK:  Sure.  And in terms of the reports

22    that were obliterated that dealt specifically with Richard

23    Winfrey, Jr., would it be possible for you to produce the

24    documentation he made of what those reports were?

01:08   25          THE COURT:  But they will be in the ones from his

1  criminal lawyers.

2          MS. STEINBACK:  Just to make sure that we have a

3  complete set.

4          THE COURT:  But you have one and then you will have

01:08  5  one and they'll be missing.

6          MS. STEINBACK:  I just want to make sure that what

7  we believe is a complete set actually is.  So, I just want

8  to make sure that nothing falls through the crack.

9          THE COURT:  Read your set and read his set and

01:08  10  then --

11          MS. STEINBACK:  Okay.  And, Your Honor, in terms of

12  the ten days when do you envision that deadline?  And I only

13  ask because I am leaving town on Saturday for ten days.

14          THE COURT:  Where are you going?

01:09  15              (Off-the-record discussion)

16          MR. PRICE:  I will say that I have got that file

17  scanned, but they haven't got it Bates-numbered yet.  So, if

18  I could get maybe two days to get it Bates-numbered just for

19  ease of use.  Is that acceptable?

01:10  20          THE COURT:  Well, when are you going to be back?

21          MS. STEINBACK:  I return on August 9th.

22          THE COURT:  All right.  So, get it read and let me

23  know by August 20th.

24          MS. STEINBACK:  Okay.

01:10  25          THE COURT:  And the same thing for anybody else.

1    And the other stuff -- I mean, you may discover in going

2    through all this that there are other sources, but the

3    attorneys that seem to exist are in the grand jury

4    testimony, the trial record and the record of the father and

01:11   5    daughter trial.

6         MS. STEINBACK:  Does the Texas Department of Public

7    Safety have anything different?  I don't know if the reports

8    of San Jacinto are going to have --

9         THE COURT:  Well, they'll have a file, but any

01:11   10   reports would have been sent to the DA for prosecution.  Did

11   the Rangers testify?

12        MS. STEINBACK:  I don't know.

13        MS. MOLINARE:  I don't know either.

14        MS. STEINBACK:  Could we request it --

01:11   15        THE COURT:  Get their file.

16        MS. STEINBACK:  Okay.

17        THE COURT:  Get all that stuff and just hold it

18   until we have looked at that report.  They need to have some

19   facts.

01:12   20             And you all, too.  If you think of something

21   you need from somebody, including the Plaintiff, then let me

22   know on the 20th.

23        MR. PRICE:  We'd just like a cleaned-up pleading so

24   we can file a 12(b)(6) motion or a Rule 56 motion on stuff

01:12   25   that's specifically pled enough to do so.

1      THE COURT:  I understand.

2      MS. STEINBACK:  So, is the Texas Rangers' motion

3  stayed pending this or --

4      THE COURT:  Yes.

01:12    5      MS. STEINBACK:  -- how do you want it?

6      THE COURT:  But don't respond.  I want to make sure

7  that you have mastered what facts are reasonably available,

8  including what's in his copy of his criminal stuff because

9  that's not sealed.

01:12   10          So, I need names, date and places.  I

11  especially need the stuff about the coerced testimony

12  because that's not going to be in any of his stuff.

13      MR. PRICE:  And I guess, Judge, since my copy has

14  been redacted, if I could get a scanned copy of her criminal

01:13   15  trial I'd like that, too.

16          MS. STEINBACK:  Sure.

17          THE COURT:  So we're both looking at the same

18  comparison.

19              Production is easy.  Getting y'all to actually

01:13   20  read it is the hard part.

21              All right.  Anything else we can usefully do?

22              You represent Fort Bend?

23      MR. MORSE:  Yes, sir.

24      THE COURT:  Does Pikett still work there?

01:13   25      MR. MORSE:  He didn't have much work after the

01:14

01:14

01:14

01:14

01:14

01:15

1   Innocence Project came down on his -- what he does for a

2   living.  He was there for probably a good year not doing

3   much and he was eligible for retirement.  He was not asked

4   to leave, but he's retired and he is a reserve just so that

5   he is in good standing with us.

6          THE COURT:  Okay.

7          MR. PRICE:  Judge, that raises one thing, one other

8   piece of information that I don't know.  She's made these

9   allegations that it was well known in the community that

10  Mr. Pikett was -- Now, I believe the record is going to show

11  that my folks didn't hire Mr. Pikett or participate in it,

12  but if she's going to try to tar them with knowledge that he

13  was unreliable I would like to see a pleading about what

14  information she claims was well known and when it was

15  published, because I believe that that may have happened

16  after the --

17         THE COURT:  Isn't that in the other case?  In the

18  other case didn't you list a whole bunch of witnesses and

19  said that were published?  Or am I --

20         MS. STEINBACK:  In the other case a senior

21  prosecutor in the Harris County DA's Office had informed the

22  Houston Police Department, which is separate --

23         THE COURT:  There weren't any Wikipedia blogs or

24  anything about this?  Because that's absolutely what I rely

25  on.

1         MR. PRICE:  I mean, I just didn't know what we were

2    alleged to have allegedly known and when we were alleged to

3    have known it.

4         THE COURT:  All right.  Let's wait until you have

01:15    5    seen all these records.  The "coerce" thing is new; so,

6    we've got to get some facts.

7         MS. STEINBACK:  Thanks, Judge.

8         THE COURT:  And what is Ms. Winfrey doing for a

9    living?

01:15    10        MS. STEINBACK:  "Ms. Winfrey" being Megan Winfrey

11   or --

12        THE COURT:  No.  The mother.

13        MS. STEINBACK:  -- the mother?  I don't know that

14   she's employed, Your Honor.  I'm not sure.

01:15    15        THE COURT:  What's Megan doing?  Isn't she --

16        MS. STEINBACK:  Yeah.  Exactly.

17        THE COURT:  So, we'll hear from you all on the

18   20th.  I will look at that and then do something arbitrary

19   and rule.

01:16    20        MS. STEINBACK:  Thank you, Judge.

21        THE COURT:  Thanks.

22            COURT REPORTER'S CERTIFICATE
             I, BRUCE SLAVIN, certify that the foregoing is a
23   correct transcript from the record of proceedings in the
     above-entitled matter, to the best of my ability.
24
                              *s/Bruce Slavin*
25                            BRUCE SLAVIN, RPR, CM