UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RICHARD WINFREY, JR. | * | CIVIL NO. H-10-1896 |
| | * | |
| VERSUS | * | Houston, Texas |
| | * | April 15, 2014 |
| SAN JACINTO COUNTY, et al | * | 10:15 a.m. |

CONFERENCE
BEFORE THE HONORABLE LYNN N. HUGHES
UNITED STATES DISTRICT JUDGE

For the Plaintiff:

        Ms. Elizabeth C. Wang
        Loevy and Loevy
        312 N May Street
        Suite 100
        Chicago, Illinois 60607

For San Jacinto County:

        Mr. Norman Ray Giles
        Chamberlain Hrdlicka
        1200 Smith Street
        14th Floor
        Houston, Texas 77002

For Fort Bend County:

        Mr. Randall Weaver Morse
        Fort Bend County Attorney
        301 Jackson Street
        Suite 728
        Richmond, Texas 77469

Proceedings recorded by mechanical stenography, produced by computer aided transcription.

1  Appearances - Con't:

2

3  For Defendant Pikett:

4          Mr. Charles S. Frigerio
           Attorney at Law
5          111 Soledad Street
           Suite 840
6          San Antonio, Texas 78205

7

8  Court Reporter:

9          Fred Warner
           Official Court Reporter
10         515 Rusk Avenue
           Houston, Texas 77002

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  All right.  I don't guess anybody wants

2  to settle this?

3                    (No Response)

4        MR. FRIGERIO:  We settled once, Judge.

5        THE COURT:  You want to settle?

6        MS. WANG:  Well, we would be willing to have

7  discussions.

8        THE COURT:  Well, wait a minute.  You're either

9  willing to settle or not.

10       MS. WANG:  Yes, yes, we are.

11       THE COURT:  Where they put the decimal point in the

12  check in the different question probably.

13       MS. WANG:  Yes.

14       THE COURT:  Do you want to set this or do you want

15  to come down here and put up with these people and me because

16  I'm worse.

17       MR. WINFREY:  I'm just willing to whatever, you

18  know, to -- sounds good to me.

19       THE COURT:  All right.  Did you have a chance to

20  look at the amended complaint?

21       MR. MORSE:  Yes, sir.

22       THE COURT:  Are you happy with the complaint now or

23  do you want to reurge some of your theories?

24       MR. MORSE:  Well, I think if we're going to go

25  forward with a bunch of discovery --

1    THE COURT:  No.  Just tell what -- answer my
2  question, please.
3    MR. MORSE:  On the 101.106(f), I think that's now
4  moot because, as I understand, the plaintiffs have dismissed
5  individual defendants on the state law claims.
6    They have substituted in the county, my county
7  and their county; and so, we would urge a different motion on
8  that, and that is --
9    THE COURT:  What's your county?
10    MR. MORSE:  Fort Bend.
11    THE COURT:  So you're Pikett's home?
12    MR. GILES:  San Jacinto County.
13    THE COURT:  And you're the location?
14    MR. GILES:  Yes, sir.
15    MR. MORSE:  And the first problem is, I don't even
16  know that we have been served.
17    THE COURT:  You are here.  You've appeared.
18    MR. MORSE:  Okay.
19    THE COURT:  Congratulations.
20    MR. MORSE:  But we would certainly urge -- I think
21  it's 101057 that says that under the Tort Claims Act we have
22  not waived immunity on getting intentional tort.  And so, I
23  think that's going to be the end of that.  In fact, I think
24  you ruled that way in our Curtis Pikett case.
25    THE COURT:  Reluctantly.

1          Did I lecture you about the insanity of saying

2   that an administrative subdivision of a state is not subject

3   to the law like everybody else?

4          Hands versus Louisiana doesn't say anything

5   about sovereign immunity.  It says, oh, it doesn't say the

6   Constitution does.

7          The 11th Amendment says that I can't hear the

8   diversity cases against the state.  That gentleman is not

9   diverse, is he?  That's the holding in Hands versus

10  Louisiana.  Well, that's the text of the amendment.

11         Now, I've forgotten the justice, but he's

12  otherwise a good justice.  "Oh, well, we always knew

13  sovereign immunity was in there."

14         Really?  Why didn't we just keep the king?

15         And San Jacinto County, Texas is sovereign?

16         No, you get it from the state.  The state's not

17  sovereign.

18         This little book (indicating) is full of

19  restrictions on states, just as it is on -- so, what does a

20  civil right listed here, a real civil right mean if you can't

21  sue the institution that perpetrates it?

22         Oh, we were just kidding.

23         That's why I think Madison, Hamilton and those

24  guys, oh, they were just kidding.  You know, that long summer

25  in Philadelphia, they didn't really mean some province of

Mexico that gets rebellious; shoot, they're immune.

This is all legal talk. I am just trying to embarrass them.

Let's apply the law. That doesn't mean I believe it. I don't inhale; I just do it.

Mr. Winfrey, this stuff's all complicated. They're going to inundate you with papers. And it shouldn't be, but it is a fact that no one can reasonably represent themselves. You can, but you can't reasonably expect a favorable outcome when you do it.

MR. WINFREY: Right.

THE COURT: I can't help you, and I am sure not going to help them.

MR. WINFREY: Yes, sir.

THE COURT: And I am not going to help her.

Nothing personal. Some of them, one or two may be fine, upstanding people. But I can't do it. It's not my job. And justice is as cold as a mother-in-law's love.

How long will it take you to do that? It's F7 on your computer, isn't it?

MR. MORSE: Not too long to do the -- this would be Fort Bend County doing a plea of sovereign immunity as to state law claims. And I can get that out pretty quick.

THE COURT: Do you know about that problem?

MS. WANG: Yes.

1     MR. GILES:  May I just expand on the problem, and
2  then she can address both aspects of the problem.
3          THE COURT:  Sure.
4          MR. GILES:  One part of the problem is there's no
5  waiver of immunity under 101.057 for intentional tort, but
6  there's also no basis force waiver under 101.021 of the Tort
7  Claims Act which requires that the injury be caused by a
8  condition or use of property.  And so, both of those
9  particulars aspects are problems for the claims against the
10 counties.
11         THE COURT:  Well, what about the civil rights claim?
12         MR. GILES:  The civil right claim, they have the
13 claim against the county.  We'll just have to defend that as
14 we do the rest of the claims.
15         MR. MORSE:  But as to us, I don't think they have
16 that claim against the county.
17         MS. WANG:  That's correct.
18         THE COURT:  They're here anyway.  Why don't you go
19 ahead and sue them.
20              So do you have a response to that?
21         MS. WANG:  They are correct that under 101.106(f)
22 the governmental employees move to dismiss, and under that
23 provision, they're dismissed.
24              We amended our pleadings, named governmental
25 immunity instead as provided in that subsection.  The

governmental units apparently like to assert immunity under
101.1057.  And that is correct.  And so, they're immune.
There is no reason that we can sue on the state law
prosecution claim.

However, that means that Ms. Winfrey has a
potential due process claim under Section 1983 because Texas
does not provide adequate state law remedies.

MR. GILES:  Well, certainly that's been considered
by the Texas Supreme Court, and that's not going to work out,
but that's okay.

MS. WANG:  It has not been considered by the Fifth
Circuit and the Seventh Circuit recently held in a case that
exact same thing on Indiana.

THE COURT:  The Seventh Circuit?

MS. WANG:  The Fifth Circuit has not decided.

THE COURT:  Well, has the Supreme Court said
anything?

MS. WANG:  The Supreme Court has not.

THE COURT:  The Supreme Court is the one that messed
it all up.

You know, Justice Breyer, when he was first on
the Court when the issue of sovereign immunity came back up,
he wrote a beautiful explication of why it was dead wrong and
then said but, stare decisis dictates we -- no, that's not
what stare decisis is.  That's not Latin for institutionalize

1  your mistakes.

2              They correct themselves infrequently -- I will

3  rephrase that -- not frequently enough.  But to say it's dead

4  wrong, but I am not going to vote against throwing it out

5  when it's something we made up from the whole cloth in 1882

6  or '4; strange way of articulating the Constitution.  They

7  frequently do stuff like that, strange things.

8              9 people, 14 opinions, that's 7 rulings and

9  footnotes.  That's assuming you can find any three people who

10  agree on anything to form a majority.  They're not good at

11  that.

12              All right.  So we are going to deal with the

13  Constitution.

14          MS. WANG:  Yes.

15          THE COURT:  Mr. Winfrey, you need to file a piece of

16  paper right after she files what she files that says "I join

17  in whatever the other folks say."  Is that okay?

18          MS. WANG:  Yes, sir.

19          THE COURT:  I don't want him to default.  But you

20  got to do that on your own.

21              And if you're up there at home and you're

22  talking to somebody and they say, well, I'm a lawyer and I'll

23  do all this stuff, but I don't want to represent you, they

24  can't do that.  It's against the rules to appear to be

25  without a lawyer while you have got one hidden up there in

the barn somewhere.

MR. WINFREY: Well, I don't have one hid. You can probably tell by now.

THE COURT: Well, sometimes San Jacinto wishes they had hidden theirs, but sometimes maybe not.

Since we are dealing with an American Constitution and American law, I don't care where the reasoning comes from, so the 7th Circuit is fine.

I even read 9th Circuit cases, not often with a straight face, but it's American law. It's the reasoning that counts in cases, not the town where the court sits.

And I will rely on reasoning from anywhere, the Ohio Court of Common Pleas. If the reasoning is good on parallel facts, logic is universe.

Where are we on the facts? I thought we knew all of the facts we needed to know except the new ones, I guess.

MR. GILES: Well, I think that we do know the facts, most of the facts that pertain to the prosecution. Certainly in the Richard Winfrey, Jr. case we've gotten that to a position to where we had the facts all from that all laid down. We did get the recent claim from Megan Winfrey.

THE COURT: But she's got the whole trial record. I mean, she had a lawyer, I take it?

MS. WANG: At the trial, yes.

1    MR. GILES:  Right.  And I think really, as far as

2 we're concerned, there is not a big difference in those facts

3 either.  I believe that Fort Bend County believes that there

4 are a lot of facts in Meagan's case that they believe that

5 need to be developed further.

6         As far as the plaintiff and I, I believe that

7 we general generally have an idea on the necessary facts,

8 but I believe the --

9    THE COURT:  Whatever the judgment renders on them,

10 the facts are fairly obvious.

11         The Court of Criminal Appeals is not quite like

12 the Federal Circuit that just makes up the facts and the law

13 in patent cases willy-nilly.

14         So they probably didn't make up a lot of facts,

15 did they?

16    MS. WANG:  No.

17    MR. GILES:  No.  Certainly the Court of Appeals

18 dealt with it before the Court of Criminal Appeals dealt with

19 it as well.

20    THE COURT:  What do you need?

21    MR. MORSE:  Well, there is a couple things.  We

22 settled the Winfrey, Jr. case hoping to sort of be done with

23 all this.  And the allegation against --

24    THE COURT:  You are done with him.

25    MR. MORSE:  We hope so.

1          But the allegation against my client, Keith

2    Pikett, is that everything he does is a fraud.  And I don't

3    think that there is going to be anybody who's a fact witness

4    that comes into court and says, I've got proof of this.  It

5    all --

6          THE COURT:  Well, does the pleading have some

7    specificity?

8          MR. MORSE:  Oh, there is more specificity as the

9    cases have gone on, more and more theories about, well, he

10   did this.

11         THE COURT:  I don't want theories.  I want facts.

12         MR. MORSE:  And the problem is that it all boils

13   down to what experts think.  And we --

14         THE COURT:  Boils down to what I think.

15         MR. MORSE:  We didn't get into all that on the

16   previous case because in Winfrey Jr.'s case there was a mixup

17   on the some scent pads.  That was the one thing that Keith

18   Pikett was not to know anything about, because if he was

19   going to do a valid test, he would have dogs looking for a

20   scent; and he's the last person on the planet who should know

21   where the suspect's scent pad is.

22              Turns out the ranger got those scent pads mixed

23   up.  We have no knowledge about that, we can't explain it, We

24   don't even know what it means.  So we took depositions, and

25   the ranger couldn't tell us when the scent pad mixup had

1    occurred.  So, it's kind of a mess for us.  And we just got
2    that case settled and hoped to be done with it.
3                 Now, that problem we think affected Winfrey,
4    Jr.  We don't think it affected Megan.  So we have got an
5    issue in that case that was highly critical to us, and over
6    in this case we think it's irrelevant.
7                 But we didn't go down any further with all
8    these expert opinions.  There's six experts who think Pikett
9    is no good, and there is equal number who think he's great.
10   So we have to --
11               THE COURT:  Both of them are probably wrong.
12               MR. MORSE:  We will have to get into all that at
13   this point.
14               THE COURT:  We are not going to do six of anything.
15               MR. MORSE:  Well, once we get designations and
16   reports, we can narrow all that down.
17               THE COURT:  Well, we are going to get a report.  I
18   mean, what else is there other than handling the dog?
19               MS. WANG:  I don't -- and I agree with Mr. Giles;
20   but in Megan's case, because Megan and Richard, Jr. were
21   prosecuted and investigated by the same people and on the
22   same facts, there is really not any discovery that we are
23   seeking to do.
24               I mean, Mr. Morse is correct that because
25   Pikett settled Junior's case, they never got to do expert

discovery as to Pikett.

THE COURT:  My question, ma'am, was very simple.
What did you all do, get together and agree not answer any of
my questions?

My question was:  Why can't -- there is only
one thing we need a technician, and that's about dog
processing and dog sniffing.  Why would there be one more
than one technician per side?

MS. WANG:  I agree with you, Your Honor.

THE COURT:  Okay.  So there will be four max.

MR. MORSE:  I don't have a problem with that, Your
Honor; but they submitted two reports, actually three in the
previous case against us.  So they have submitted affidavits,
reports, whatever for three different guys.  And so, if they
want to commit to one --

THE COURT:  In Winfrey, Jr.'s case?

MR. MORSE:  Yes, sir.

THE COURT:  All right.  That's fine.  I didn't get
to pruning notes because I held on a different ground; and
so, we're just going to ignore all those, and she is going to
go back and think about it and she is going to pick a
technician, but I take that seriously.

I'm a lot older than you are -- I don't know
whether you noticed that -- and I lived through the period
where a resume' stapled to a sheet of paper was an expert.

And I am not big on credentials anyway; I'm big on logic, but you have to have some credential. I have had people object the person was an immunologist and not a neuro immu something. That's silly.

I have had an obstetrician testify about ophthalmological problems, a fairly simple ophthalmological. Simple if you had it, not simple if I had. Because the guy was a doctor, the report made sense, what he had to say, medical references and everything.

I don't want, like, say, in death penalty cases, you get about 12 experts who write nothing but press releases about how bad the death penalty is -- that's a nautical clock above your head; you weren't hearing bells, although I have that effect on people.

And are you all going to have one or one apiece?

MR. GILES: Well, I have a law enforcement expert. I don't need a dog handling expert, and I have no interest in getting one, so I just have a --

THE COURT: What's a law enforcement expert? I thought that was every officer at San Jacinto County.

MR. GILES: No. I have an officer who is an expert on doing criminal investigations and on law enforcement training who does primarily those kind of things.

THE COURT: Well, I am not big on the training

1  argument.  It is not often the training that's amiss; it's

2  the performance.

3          That pilot came in, who allowed the autopilot

4  to come in low in San Francisco had not been trained to rely

5  on only the autopilot to land a giant airplane.  You notice

6  the only people hurt and got killed in that accident were the

7  people without their seatbelts on.  That's very sad.  I think

8  it was two teenage girls who did not put their seatbelts on.

9          What's he do for a day job?

10          MR. GILES:  He's a retired FBI agent, Mark Young.

11          THE COURT:  Does he know me?

12          MR. GILES:  Yes, sir.  He does.

13          THE COURT:  Tell him I really meant to be nice to

14  him.

15          MR. GILES:  I will.

16          THE COURT:  Does he have a report?

17          MR. GILES:  Yes, sir.

18          THE COURT:  Has she seen it?

19          MR. GILES:  Yes, sir.

20          THE COURT:  So are you going to have an officer

21  procedure and a dog procedure?

22          MR. MORSE:  I was going to say, I think we're going

23  to need two because one -- there is a general allegation out

24  in the world that all of this dog stuff is junk science, and

25  so, I am going to need somebody --

THE COURT:  That's by people that don't bird hunt.
Dogs are very good if they're trained and handled properly.
I don't bird hunt, but I once had a case manager who raised
Brittany Spaniels.  They test their training by putting a
quail in the middle of their back, and they're not to lose
their point or their stance.

Can you imagine training a thoroughbred horse
that had to put a bobcat on his back and see if he'll jump?
I don't think you can train a horse that way.  Trained dogs
are fine.  They're not perfect any more than an FBI agent is
perfect.

Dogs and people vary.  It depends on the
quality of the scent, both the target scent and how old the
scent is on the ground and a bunch of other things.  But if
she has somebody who says dogs don't know what they're doing,
that won't work.  It has to be about this sniff.

I think you have to be very careful about
anything.  I mean, guard dogs.  What you want is the guard
dog to do what they want to do in the first place when you
want them to do it, and the same with hunting dogs.  I am not
sure I want a healthy beast running around the house on the
assumption he is going to remember who counts to whom.

So, what I need to know is what there is about
how these sniffs were done that makes them sufficiently
reliable to initiate a criminal prosecution, together with

1   whatever other evidence.  I mean, if you already have a

2   confession, the dog can do what it wants to.

3            MR. MORSE:  I am not so sure that we're in that

4   business to begin with.  We provide an investigative tool.

5   And I think that it's Pikett's position that there is no

6   amount of data that he can give you that alone will justify a

7   criminal prosecution.

8            THE COURT:  That's not what I said.

9            Well, probably, they show up at the scene of

10  the crime and set the bloodhounds and they tree the guy.

11  That's probably pretty good evidence.  It's not conclusive

12  because he could have just been passing through.

13           But with a few other connections, like the body

14  in the pool of blood is his ex-wife, there are little things

15  that might be hints.

16

17           (Discussion off the record)

18

19           THE COURT:  The county furnishes people with

20  firearms, patrol cars, batons, tasers, pepper spray, some

21  counties probably bullwhips and all kinds of other stuff.

22  Those are all tools.  If they're not a scalpel -- think of

23  doctors with scalpels.  It's a tool; it's how they are used,

24  right circumstances, the right way.

25           And the dog may be a drunk, I don't know; but

Pikett's supposed to get the tools he needs and go use them correctly.

I have been trying to convince my eldest grandson that a car is a tool, not a toy. Doing all right. I'm probably 27 percent there.

So, you could have an officer to say the gun went off, it malfunctioned, it went off, I didn't pull the trigger. It could be the case it's a defective gun. But I need to know about that.

Hypothesize that the dog was mad at the Winfreys or whatever. He didn't even know them. He was from Fort Bend County, wasn't he?

MR. MORSE: Yes.

THE COURT: So, give me something to work with.

And a bad result is not evidence of a defective dog or an evil officer. That's why we have all these precautions because governments are abysmally inefficient when they're not hostily motivated.

Do you know about Sheriff Parker?

MS. WANG: No.

THE COURT: Would you tell her. My version might be skewed. Not now. It has to do nothing to do with this case. He is still in prison, isn't he?

MR. GILES: (Indicating in the affirmative).

THE COURT: He was sheriff there and malevolent from

the toenails to the top of his head.

Do you know -- what was that trooper's name yesterday, Kennard or something like that, (referring to law clerk). Oh, you weren't in there. You weren't in there either.

INTERN: No, sir.

THE COURT: Good help is hard to get.

It was a state trooper who was assigned up there who was a witness in a sentencing yesterday, Kennard or something like that.

MR. GILES: Yeah. I don't know all the troopers out there.

THE COURT: Well, they rotate them, too.

The defendant had driven 10 miles that night the wrong way on the highway and killed a kid and apparently crippled his dad, for which he got 20 years. I was doing his illegal reentry.

Do you have somebody -- what kind of expert do you have?

MR. MORSE: Well, what I wanted to clarify is that part of this is hard science and part of it is soft science. Part of it has to do with human scent being unique and mass spectrometry and gas chromatography and showing visual evidence of objective proof that human scent has chemical properties that are unique.

1    Once you get that assumption, then you go into

2  handling dogs and, you know, what's the right way to handle a

3  dog and what's a valid or invalid test?

4    THE COURT:  I had a government expert in a criminal

5  trial testify that -- it was a criminal pollution case --

6  that the ships, the water in the ship's tanks and the water

7  in the shore tank was identical.  Now, of course, he had no

8  clue whether they were pumped which way, whether any pumping

9  was going on.

10    On cross-examination, he says, absolutely,

11  they're identical plus or minus 40 percent.  I instructed a

12  verdict.  That's not close.

13    And I don't know why -- I mean, apparently it's

14  not the test is that variable, it's just they were that

15  different; identical though.

16    MR. GILES:  Right.

17    THE COURT:  You think there is a question about the

18  properties of human scent?

19    MR. MORSE:  I think there is going to be an issue.

20  For example, one of the criticisms is that when we run a

21  test, the suspect has a fresh scent pad, the five fillers are

22  stale.  And our position is that's not going to confuse the

23  dog anyway, even if you assume all that, because the dog is

24  looking for a match and it's very important that the two

25  scents that he's matching A to B are unique, and he's not

1  just going to say, well, this is a fresh one and this is a

2  fresh one and all the same to me.

3         It's important to first establish the principle

4  that human scent is unique and that that's what --

5         THE COURT:  Is that doubted?

6         MS. WANG:  Well --

7         THE COURT:  I don't mean perfect, not snowflake

8  unique, but the chance that -- we actually don't know that

9  fingernails are unique; we just know we have never found

10  anybody with matching.  It's the black swan paradox.  Never

11  proved there isn't one because nobody has ever seen one.

12  That means nobody has ever seen one.

13         So, do you doubt that human scent is, in

14  ordinary practical terms, more than two standard deviations

15  reliable?

16         MS. WANG:  I don't know the answer to the question

17  as to whether human scents are unique.  What I can say is

18  that in Jr.'s case we had an expert who talked about how

19  human scents are similar and the dogs can be confused.

20         THE COURT:  Yes.  But see, that doesn't help me,

21  that you pay somebody, he'll come say the dog could have been

22  confused.  He could have been confused because he's been

23  locked up in Fort Bend County in a cage for the last seven

24  years or whatever they do with them.  That doesn't help.

25         There needs to be something either defective in

the amount of scent on a stale pad, the amount of scent on a
fresh one and some evidence that they have tested that and
tested that and tested that with a variety of dogs and found
out that there is a substantial likelihood that one of them
makes a difference and the other doesn't.

And there may be some human scents are stronger
than others in their nature. I'm convinced my brother
stinks, but that has to do with birth order more than
anything else. And it could be true.

So, let's assume that really tall people have a
strong, elegant scent and short people with too much hair
have weak scents. I don't know if that confuses the dog. I
mean, dogs hunt up things on -- actually any scent is going
to be fairly modest.

You know, quail can't leave a whole lot of
scent behind ordinarily, and bobcats, pumas and hawks would
have figured it out. So you're working on little evidence --
not you, the dog -- by its nature. It's less substantial
physically probably than the surface of your thumb that shows
up on prints.

But if you have somebody who says that if you
have the scent like we had here and its content, the case of
it would be more of this chemical but less of another
identifier, I don't know, then that's fine, but it has to not
just be "dogs get confused."

1    Horses really get confused, not olfactorily but
2  visually.  They'll spook at anything, even reasonably well
3  trained ones.

4    All right.  So I want you to go back, take a
5  deep breath, then figure out what sort of technical evidence
6  you would like to submit.  And if it's more than one on
7  chemistry and one on the essence of canines or the essence of
8  handling canines, then let me know who it is and why you want
9  them.

10    And then would you, please, ask them to write a
11  report that is short as is reasonable under the
12  circumstances.  I am not convinced by volume.

13    MS. WANG:  Yes, Your Honor.

14    THE COURT:  I once read a law review article.  I
15  wasn't convinced.  Actually I have committed a couple of law
16  review articles myself.

17    You see what she says, then you tell me what
18  you want to respond.

19    MR. MORSE:  Okay.

20    THE COURT:  You, too.  I think we know what you're
21  going to talk about.

22    MR. GILES:  Right.

23    THE COURT:  Anything you want to add?

24    MR. FRIGERIO:  Not at this time, Your Honor.

25    THE COURT:  Well, this would be a good time to talk

about particular technicians, otherwise we're not going to
talk about them until we -- we'll go with theirs.

MR. FRIGERIO:  I think two is substantial.

THE COURT:  Were you a marine?

MR. FRIGERIO:  No, Your Honor.

THE COURT:  I have the same tie, but I think that's
the tie marine officers wear.

MR. FRIGERIO:  Just say the federal seal.  It's from
South Carolina.

THE COURT:  All right.  Anything else we can
usefully do?

MS. WANG:  No, Your Honor.  I just do want to
mention that I do know that in response or in conjunction
with Mr. Giles' law enforcement expert, we also have a law
enforcement expert.

THE COURT:  Wait until you read his.  You may not
need one.

MS. WANG:  Okay.

THE COURT:  If you read it, then you can object to
it, and then if I overrule that or overrule part of it and
you still don't like the remainder, then you can get your
own; but don't waste money on doing that until we find out
whom he has found.

I had somebody who does ground water stuff
testify that the guy's well here was polluting the guy's well

up here; and while the surface does not tell you what the
subsurface is, this was a hundred-foot deep aquifer of
gravel, both of them surface, and I held that physics applies
all over Texas.  Even without your consent, it just does, and
things don't flow up.

                    And you could have a hill that went up here and
so the flow was actually going like that, but that wasn't the
case.  I'm not sure we have any hills that big in Texas.

                    So see what they have to say.  When will you be
ready to submit your technician?

          MR. GILES:  Well, my expert's report is written.
She already has it.  I can send it out when I get back to the
office to everyone.

          THE COURT:  Do you know where it is, because he will
send it to you again if you have lost it.

          MS. WANG:  Yes.

          THE COURT:  She's actually already deposed my expert
as well.

          MS. WANG:  They have ours as well.

          MR. GILES:  Right.

          THE COURT:  All right.  Well, look back at that
stuff and then object if you want to.

          MS. WANG:  Yes.

          THE COURT:  But no hired witness is going to get up
and start discoursing on life in general, whether it's the

sanctity of the county or the viciousness of using poor
helpless puppies in this enterprise.  Whatever it is, get
some specifics and move on.

MR. GILES:  So, if I understand Your Honor, do you
want me to send the expert report, file that as well with the
Court and let the Court review it or do you want me to --

THE COURT:  Not until she says something.  Well, why
don't you send it to me.

MR. GILES:  Okay.

THE COURT:  I don't think you've ever read one of
those.  I'll make him read it.

MS. WANG:  Would Your Honor like to see our expert
report?

THE COURT:  Well, not until I decide his, because I
may not like it.

But I would like you -- you can just send it to
me or you can file it, but at least file a designation that
San Jacinto County rests with so in so as his technical
witness, because, you know, if she or I shoot big old holes
in it, you don't get to name another one and try again.
We're not playing ping-pong.

MR. GILES:  I understand, Your Honor.  We try to do
it well the first time.  Hopefully we did succeed.

THE COURT:  How about your technicians?

MR. MORSE:  Well, the only thing I could say is that

1   we had gotten far enough along in a previous case to have

2   located I am going to say four people.  We are not going to

3   need four this time, but we at least know who is out there.

4          THE COURT:  What kind of people?

5          MR. MORSE:  Well, in the chemistry, Kenneth Furton,

6   who is the Dean of Florida International University.  He's a

7   PhD in chemistry, and he's done a lot of studies on human

8   scents.

9          THE COURT:  Speak up so Fred can get it all.

10         MR. MORSE:  Human scent identification.  And

11  actually has some involvement with a Scientific Working Dog

12  Group, I think it's called; and they're developing protocols

13  for scent pad lineups.

14              Now, this was all being done back in 2010, so

15  it's been a while since I have visited with him; but that was

16  where we were at that time.

17         THE COURT:  Well, have you seen her attack on dogs

18  in general?

19         MR. MORSE:  No.  I have seen -- Nicely is one of the

20  experts, Steven Nicely, and Doug Lowery.

21         THE COURT:  Who do you want to use on dogs are

22  unreliable?

23         MS. WANG:  We can use Steven Nicely, Your Honor.

24         THE COURT:  We'll, no.  You would like to use him.

25         MS. WANG:  We would like to use him.

        THE COURT:  Do you have a report that is specific to
this case?

        MS. WANG:  Yes, Your Honor.

        THE COURT:  If he goes more than two pages without
mentioning something about the Winfreys and the counties, I
lose interest.

        MS. WANG:  Yes.  It is something to do with the
case.

        THE COURT:  Do they have his report?

        MS. WANG:  Yes.

        MR. MORSE:  On the Richard Winfrey, Jr., which is
basically the same case.

        MS. WANG:  It's the same dog scent lineup as with
Megan.

        THE COURT:  They ran two?

        MR. MORSE:  I'm sorry?

        THE COURT:  They ran two different?

        MR. MORSE:  Yes.

        MR. GILES:  Same day.

        MR. MORSE:  They actually ran two dogs on Richard,
Jr. and then two dogs on Megan and another one on Adam Zarf,
I think, so there were a total of six.

        THE COURT:  Is that the boyfriend?

        MR. MORSE:  That's actually a friend of the
boyfriend, I think.

1          THE COURT:  All right.  I just remembered there was
2      a boyfriend.
3          MR. MORSE:  And actually, he was in the first
4      lineup, which is not usually the way it's done, but that's
5      how they did it in this case.
6          THE COURT:  All right.  Well, look at Nicely's
7      report.  And it's been tailored to the current problems?
8          MS. WANG:  Yes -- okay.  Well, what do you mean by
9      "the current problems"?
10          THE COURT:  We got the woman in it now.
11          MR. MORSE:  Megan.
12          MS. WANG:  Megan.
13          THE COURT:  Megan.
14          MS. WANG:  Oh, no, it hasn't.  That one was
15      disclosed for Richard, Jr., but we can submit a new one.
16          THE COURT:  We need Richard, Sr. and Megan in there
17      because unless he's examined all of the wrongs that were done
18      that day, it will be incomplete.
19          MR. MORSE:  There is several issues.  One is the
20      report on Richard, Jr.  I think -- I want to say it's 26
21      pages.  It is rather lengthy and it has a lot of boilerplate
22      language in it that I don't necessarily need, but it doesn't
23      hurt if it's that long.
24          THE COURT:  Include Megan and focus it.
25              You have only seen me when I am not impatient.

When I start reading downloaded stuff, which I think the
modern, you can sum up modern pleading by download and hope.
This was used somewhere.  Let's use it.

I get cases where they, it's all about Charlie
Johnson the first two pages.  Page 3 turns into Shirley
Ferguson.

Your technician has to write a report that is
about these folks and these folks and gets to it with science
and rigor.  And press releases don't get it.

MR. GILES:  Now, of course, my report was written
for Richard, Jr. also, so I understand you want me to also
have my expert update his report or you want --

THE COURT:  I don't know what he says, and I don't
know how it would differ if he said it for the other people.
So you look at it and decide, but I can't just assume that
Megan and Mr. Winfrey are just like the brother.

MR. GILES:  Right.

MR. MORSE:  Judge, if I could point out, there is a
substantial difference on Richard Winfrey, Sr. in that the
lineup done in his part of the case was done in 2007, and
Megan and Richard, Jr. were done in 2004.  So, it's a
completely different time frame and a completely different
location; and as I recall, it's a much better video.

The first video is off in a field, and they had
to move several times.  It was windy and a lot of grass and

1 you can't even see the cans. It's just not a very good

2 video.

3       The second one is done, as I recall, in a

4 baseball field in Bellaire. It's a good video. You can see

5 what's being done. Now, how that's going to affect the

6 report, I can't tell you, but it would be substantial --

7       THE COURT: You know, Mr. Winfrey, it was done in a

8 baseball field, and for Megan and Winfrey, Jr., it was done

9 in a more natural setting.

10       MR. MORSE: Yes.

11       And I think it would affect -- if the expert is

12 studying those videos, he is going to have a totally

13 different video and a different time frame as well. I don't

14 know if that affects his opinion.

15       THE COURT: Well, he is not going to opine about Mr.

16 Winfrey, is he?

17       MS. WANG: No, Your Honor.

18       THE COURT: Okay.

19       MR. MORSE: Okay.

20       THE COURT: So I want you to explain it to me

21 because, while I am not going to represent him, I have the

22 think skepticism about everybody; and so, it would help any

23 motions you might have or any trial that you explain why this

24 one's different from the other two.

25       MR. MORSE: I guess my only confusion is that I

wouldn't be responding to Steven Nicely.

THE COURT:  No.  You would be responding to my need to know what happened.  I'm not a rubber stamp to bad lawyering or non-lawyering.

MR. MORSE:  Okay.

THE COURT:  Anything else?

MS. WANG:  I don't believe so, Your Honor.

THE COURT:  All right.

Shall I give you 28 days or so to make sure you're happy and re-tailor, do whatever you want to do for the reports?

MS. WANG:  I think that should be sufficient.

THE COURT:  Don't write the date down.  I will get you an order.

And same for you?

MR. GILES:  Yes, Your Honor.

THE COURT:  Y'all just pass each other in the mail, and then two weeks after that to move either for a hearing or just move to eliminate paragraph 17, whatever --

MS. WANG:  Your Honor, I'm sorry, but as to -- so we have Steven Nicely, the dog expert, the law enforcement expert.  Should we disclose the law enforcement one at the same time as Mr. Giles discloses his?

THE COURT:  Sure.

Does Fort Bend have a technician on procedures

and processes from law enforcement?

MR. MORSE: Not that I know of.

THE COURT: Do you think your clients have a claim against Fort Bend County?

MS. WANG: No, no.

THE COURT: About negligent police administration or something?

MS. WANG: No.

THE COURT: Okay. So you don't need them.

MR. MORSE: Hope not.

THE COURT: Please don't file one.

Are you going to have a dog and a procedures guy for your client?

MR. FRIGERIO: We'll use the same, Your Honor.

THE COURT: So, you still got to file a report.

All right. Get them all done at the same time, then take two weeks to figure out whether any of them said anything, and then file your objections, and we'll either get together or do something because I want to minimize her travel.

Anything else for San Jacinto County?

MR. GILES: No, Your Honor.

THE COURT: For Fort Bend?

MR. MORSE: No.

THE COURT: Mr. Pikett?

1          MR. FRIGERIO:  Yes, Your Honor.  Will there be some

2    time for discovery in this Megan case that was just recently

3    filed?

4          THE COURT:  What do you need to know?

5          MR. FRIGERIO:  As far as there may be some

6    depositions that we need to take.

7          THE COURT:  About what?  I thought we already had --

8    we have the record in the criminal case where everybody

9    testified about what did what to whom.  Pikett was

10   cross-examined by the lawyer.

11         MR. FRIGERIO:  We do have the criminal trial.  The

12   plaintiffs have never been deposed in either case.

13         THE COURT:  Where is Megan?

14         MS. WANG:  She's in Cold Spring, I believe.

15         THE COURT:  Just east of Cut N Shoot?

16         MR. WINFREY:  Right, yes, sir, up on Lake

17   Livingston, between Huntsville and Livingston kind of.

18         THE COURT:  Have you been to San Jacinto County?

19         MS. WANG:  I have not.

20         THE COURT:  Well, if you do, obey the speed limits

21   once you get outside of Houston.  There is Porter and

22   Shenandoah and several infamous speed traps.

23              I had a big case where the distinguished public

24   servants, I think for Shenandoah, fell into fighting among

25   themselves instead of preying on civilians.  Almost as bad as

 1  "they're keeping more of my bribes than they're supposed to."

 2  But go the speed limit.

 3          MS. WANG:  Yes, Your Honor.

 4          THE COURT:  Any questions I can answer, Mr. Winfrey?

 5          MR. WINFREY:  One quick one.  You told me I need to

 6  send you letters saying I would like to just follow suit

 7  with --

 8          THE COURT:  Get him something.

 9          MR. WINFREY:  I mean, I just need to kind of know

10  exactly what I need to do.

11          THE COURT:  Well, the problem is I can't tell you

12  exactly.

13          MR. WINFREY:  It was a motion of some kind, right?

14          THE COURT:  Just say "I join the other plaintiffs'

15  motions."

16          MR. WINFREY:  And send it to --

17          THE COURT:  Go get the address and put this case

18  number on it.

19          MR. WINFREY:  Yes, sir.

20          THE COURT:  That's 10-1896.  No.  That's Jr.'s.

21          MR. WINFREY:  14 something.

22          THE COURT:  14-710 looks like it's you.

23          MR. WINFREY:  Yes, sir.

24          THE COURT:  Put that on there, if you can read that.

25          MR. WINFREY:  Thank you, sir.

1      THE COURT:  There are cases when I have to ask my
2  secretary "what I did write here?"
3          Any questions?
4      MR. MORSE:  No, Your Honor.
5      MR. FRIGERIO:  No, Your Honor.
6      MR. GILES:  No, Your Honor.
7      MS. WANG:  Your Honor, Mr. Morse filed a motion to
8  dismiss Megan's case on statute of limitations grounds, and
9  we would like to file a written response.
10      THE COURT:  A brief one?
11      MS. WANG:  Yes.
12      THE COURT:  Certainly.  When can you do that?
13      MS. WANG:  Two weeks, 14 days.
14      THE COURT:  Okay.  Don't tell anybody I was nice to
15  you.
16      MR. GILES:  Your Honor, do you prefer to handle the
17  statute of limitations issue at this point on a motion to
18  dismiss or in some other form?
19      THE COURT:  You got to do it as a motion.  If I were
20  you, I'd file a motion to dismiss, follow it with a motion
21  for summary judgment, get it all done.  I mean, the dates and
22  everything are --
23      MR. GILES:  Then I will file one as well very
24  promptly.
25      THE COURT:  Like tomorrow?  Oh, take 'til noon

1   Thursday.

2              I had some lawyer, I gave him a date 30 days

3   out, and he said, could I have a different date?

4              And I said, sure.  And I gave him one 14 days

5   out.  Apparently that's not what he meant.  Be specific in

6   what you ask for.

7              All right.  Thank you, counsel.

8

9

10             (Conclusion of proceedings)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION

I, Fred Warner, Official Court Reporter for the United States District Court for the Southern District of Texas, Houston Division, do hereby certify that the foregoing pages 1 through 38 are a true and correct transcript of the proceedings had in the above-styled and numbered cause before the Honorable LYNN N. HUGHES, United States District Judge, on the 15th day of April, 2014.

WITNESS MY OFFICIAL HAND at my office in Houston, Harris County, Texas on this the 1st day of July, A.D., 2014.

_____
Fred Warner, CSR
Official Court Reporter